**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| KEITH MULLETT, | ) CASE NO. 5:15-CV-144 |
| Plaintiff, | ) |
| v. | ) MAGISTRATE JUDGE VECCHIARELLI |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) |
| | ) **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) |

Plaintiff, Keith Mullett ("Plaintiff"), challenges the final decision of Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381. ("Act").  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this Memorandum Opinion and Order.

## I.  PROCEDURAL HISTORY

On June 27, 2011, Plaintiff filed his applications for POD and DIB, alleging a disability onset date of March 19, 2011. (Transcript ("Tr.") 27.)  The claims were denied initially and upon reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ").  (*Id*.)  On July 2, 2013, an ALJ held Plaintiff's hearing. (*Id*.)  Plaintiff participated in the hearing, was represented by counsel, and testified.

(*Id*.) A vocational expert ("VE") also participated and testified. (*Id*.) On July 26, 2013, the ALJ found Plaintiff not disabled. (Tr. 40.) On November 28, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1.)

On January 25, 2015, Plaintiff filed his complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12, 15, 16.)

Plaintiff asserts the following assignments of error: (1) The ALJ violated the treating physician rule; (2) the RFC is not supported by substantial evidence and new and material evidence warrants remand; and (3) the ALJ's hypothetical question to the VE did not accurately portray Plaintiff's functional limitations.

## II. EVIDENCE

### A. Personal and Vocational Evidence

Plaintiff was born in May 1968 and was 42-years-old on the alleged disability onset date. (Tr. 38.) He had at least a high school education and was able to communicate in English. (*Id.*) He had past relevant work as a welder and a press operator. (*Id.*)

### B. Medical Evidence

#### 1. Medical Reports

In 2004, prior to Plaintiff's alleged onset date of March 2011, Plaintiff underwent a vestibular test due to complaints of dizziness. (Tr. 302-03.) Judith White, M.D., diagnosed vertigo. (Tr. 303). On January 3, 2005, Plaintiff had an MRI of his cervical

-2-

spine. (Tr. 309.)  The image showed mild, diffuse cervical canal stenosis, a disc osteophyte at C6-7 with sac compression, and no overt cord compression. (*Id.*)

During March 2011, Plaintiff treated with Douglas Wenger, M.D., and had been laid off from his job as a welder. (Tr. 315.)  Plaintiff felt he could no longer work as a welder because of back pain. (*Id.*)  Dr. Wenger listed diagnoses of back pain, fibromyalgia, depression, and vertigo. (*Id.*)

A treatment note dated March 30, 2012, included Plaintiff's comment that he was performing yard work for a friend and cutting grass. (Tr. 384.)  A few months later, on August 15, 2012, Plaintiff presented to Kathleen Scroggins, M.D. (Tr. 444-46.)  Plaintiff denied dizziness and headaches, but complained of all-over body pain that increased with any activity. (Tr. 444.)  He reported a recent increase in low back pain that radiated down both legs. (*Id.*)  Due to pain, it took Plaintiff three times as long to mow grass. (*Id.*)  He had spasms in his back at night. (Tr. 454.)  Dr. Scroggins assessed benign hypertension, fibromyalgia, vertigo, and radiating low back pain. (Tr. 446.)  She prescribed medication. (*Id.*)

After a fall that caused him to hit his chest in September 2012, Plaintiff saw Dr. Wenger. (Tr. 441.)  Plaintiff reported that the fall occurred after he had worked outside all day, had lit a bonfire, and had some alcoholic beverages. (*Id.*)  Plaintiff reported that the next thing he remembered after falling was that the police and paramedics were at his side. (*Id.*)  Plaintiff's wife had witnessed similar "episodes" in the past. (*Id.*)  Dr. Wenger ordered tests to examine seizure-like activity. (Tr. 442.)

On October 5, 2012, Plaintiff saw Kimberly Stewart, M.D., for fibromyalgia. (Tr.

-3-

435-37.) Plaintiff also described a 12 year history of syncope and vertigo. (Tr. 435.) He did not sleep well and experienced fatigue that became worse as the day progressed. (*Id.*) Plaintiff complained of headaches, heart palpitations, back and joint pain, swelling in his hands, muscle aches, dizziness, and paresthesias in the arms and legs. (*Id.*) During an examination, Dr. Stewart found that Plaintiff displayed "a few tender points." (Tr. 436.) The doctor diagnosed myalgia, polyarthralgia, syncopal episodes, and vertigo. (Tr. 437.) Dr. Stewart stated that she would pursue additional testing in light of mild weakness exhibited on physical examination. (*Id.*) She opined that Plaintiff appeared unusually fatigued after the examination and recommended testing for myasthenia. (*Id.*) Dr. Stewart also wanted a work up for inflammatory arthritis and myopathy, as well as an MRI of Plaintiff's neck due to his history of fainting spells and vertigo. (*Id.*)

Plaintiff returned to Dr. Stewart on December 12, 2012. (Tr. 420.) Dr. Stewart explained that Plaintiff's most recent MRI was "notable for a disc at C6-7" that was "moderate sized in nature." (*Id.*) Otherwise, tests for myasthenia and rheumatoid arthritis returned normal. (*Id.*) Dr. Stewart assessed cervical disc disease and referred Plaintiff to a neurosurgeon. (Tr. 422.)

On January 4, 2013, Glenn Black, M.D., admitted Plaintiff to Barberton Hospital. (Tr. 394.) Dr. Black noted that Plaintiff had a recurrent history of syncope and episodes of dizziness. (*Id.*) The doctor placed Plaintiff on a halter monitor, which showed periods of asytole, or failure of the heart's electrical system. (*Id.*) On January 7, 2013, Dr. Black installed a pacemaker. (*Id.*) The following day, Dr. Black discharged Plaintiff in much

improved condition. (*Id.*)

Plaintiff presented to Harvey Vucetic, M.D., on January 14, 2013, for pain in his cervical and lumbar spine as well as fibromyalgia. (Tr. 494.) Plaintiff described his cervical spine pain as "constant" and radiating into his arms, hands, and lower back. (*Id.*) His low back pain radiated down his back to the top of his feet. (*Id.*) Plaintiff also indicated that Dr. Wenger had previously diagnosed fibromyalgia. (*Id.*) On physical examination, Plaintiff's gait, extremity strength, and neurological examination were normal. (Tr. 497-98.) Plaintiff's cervical MRI showed a moderately sized C6-7 disc herniation. (Tr. 498.) Dr. Vucetic diagnosed a herniated cervical disc without myelopathy, cervical neuralgia, and thoracic or lumbar radiculitis. (*Id.*) He referred Plaintiff to physical therapy and recommended a cervical epidural injection as the next step in care if pain persisted. (Tr. 498-99.) The doctor also diagnosed myalgia and myositis, commenting that Plaintiff "definitely [was] suffering from fibromyalgia pain." (Tr. 499.) Dr. Vucetic instructed Plaintiff that exercise was the best treatment for fibromyalgia. (*Id.*)

On February 11, 2013, Plaintiff treated with Dr. Vucetic for lumbar spine pain that radiated into his right leg. (Tr. 488.) Dr. Vucetic noted that Plaintiff was seeing a physical therapist for his cervical spine, and physical therapy exercises were helpful but provided only short-term relief. (*Id.*) Plaintiff rated his pain as a "6 out of 10." (*Id.*) On physical examination, Dr. Vucetic found reduced sensation around C5-C6, reduction in cervical range of motion, and normal bilateral upper extremity strength. (Tr. 491.) Plaintiff's upper extremity neurovascular examination was normal. (*Id.*) Dr. Vucetic

assessed sciatica due to lumbar disc displacement, radiculitis, and cervical disc displacement. (Tr. 492.) Because Plaintiff complained of radiating low back pain, Dr. Vucetic added a low back regimen to his physical therapy plan. (Tr. 488, 492.)

Plaintiff treated with Dr. Wenger on February 14, 2013. (Tr. 416.) Plaintiff reported that he had improved since receiving a pacemaker and had not experienced fainting spells. (*Id.*) Dr. Wenger adjusted Plaintiff's medication to treat hypertension and prescribed wrist splints for carpel tunnel syndrome. (Tr. 418.)

On April 22, 2013, Plaintiff treated with Dr. Vucetic for cervical and lumbar spine pain, as well as some left wrist pain that extended into his thumb and index finger. (Tr. 470.) Dr. Vucetic noted that Plaintiff had been very active lately and painted an entire barn. (*Id.*) Plaintiff requested a third epidural injection for lumbar spine pain that had returned. (*Id.*) Dr. Vucetic assessed displacement of a lumbar disc, obesity, and carpal tunnel syndrome. (Tr. 474-75.) The doctor prescribed a lumbar spine epidural injection, a carpal tunnel splint for the left arm, and an anti-inflammatory. (*Id.*)

On May 13, 2013, Dr. Wenger recommended that Plaintiff continue using wrist splints for carpal tunnel and consider wrist injections if neck injections did not provide relief. (Tr. 415.)

A report from Dr. Vucetic, dated May 22, 2013, indicated that Plaintiff presented with cervical and lumbar spine pain. (Tr. 459.) Plaintiff stated that as of late, he had been welding a lot more and woke up with pain starting in his elbow and radiating into his thumb. (*Id.*) Plaintiff complained of neck pain radiating down into his arms and fingers, which he described and burning with numbness and paresthesias. (*Id.*) Dr.

-6-

Vucetic diagnosed obesity, cervical disc displacement, myalgia and myositis, cervical radiculopathy, displacement of a lumbar disc, and lateral epicondylitis. (Tr. 464-65.)

### 2. Agency Reports

On October 13, 2011, Morgan Koepke, M.D., conducted a physical consultative examination of Plaintiff. (Tr. 330-32.) Plaintiff complained of all-over body pain, primarily in the neck and back, and general fatigue due to fibromyalgia. (Tr. 330.) Plaintiff also complained of vertigo, which could cause a shaking sensation, nausea, or vomiting. (*Id.*) His vertigo had improved over the years and no longer occurred on a daily basis. (*Id.*) In terms of activities, Plaintiff could drive a car and had difficulty with stairs due to pain. (Tr. 331.) He was able to sit or stand for 30 minutes, walk half a block, and lift or carry up to 40 pounds. (*Id.*) He could perform self-care, cook, and clean. (*Id.*)

Upon physical examination, Dr. Koepke found that Plaintiff had a normal range of motion in his cervical and dorsolumbar spine, and only mild tenderness in the lower cervical area. (Tr. 331.) His straight leg raising tests were negative. (*Id.*) Plaintiff had good grip strength bilaterally and a full range of motion and strength in all extremities. (*Id.*) Dr. Koepke noted that Plaintiff tested positive for six out of 18 fibromyalgia tender points. (*Id.*) The physician commented that Plaintiff did not say that the points were tender until she palpated them a second time and told Plaintiff to report what hurt. (*Id.*) Plaintiff's neurological examination was normal. (Tr. 332.)

Dr. Koepke opined that Plaintiff would be able to participate in full work duties without any restrictions. (Tr. 332) He would be able to stand for up to six hours in an

eight-hour workday and could lift and carry up to 40 pounds on a regular basis. (*Id.*) Dr. Koepke reviewed treatment notes from Plaintiff's primary care physician and reported that she could not see where the physician performed tests for fibromyalgia. (*Id.*) Dr. Koepke opined that Plaintiff's examination that day was not consistent with a diagnosis of fibromyalgia. (*Id.*)

State agency physician Maureen Gallagher, D.O., conducted a review of the record on October 27, 2011. (Tr. 132.) Dr. Gallagher opined that Plaintiff could occasionally lift up to 50 pounds and frequently lift up to 25 pounds. (Tr. 131.) He could stand, sit, or walk for approximately six hours in an eight-hour workday. (*Id.*) Plaintiff needed to avoid all exposure to hazards, such as machinery and heights. (Tr. 132.)

On March 6, 2012, Leigh Thomas, M.D., performed a second review of the record. (Tr. 149.) Dr. Thomas affirmed Dr. Gallagher's opinion in total. (Tr. 147-48.)

**C.     Hearing Testimony**

**1.     Plaintiff's Hearing Testimony**

Plaintiff testified that he stopped working as a welder due to pain in his arms and back. (Tr. 78.) He experienced pain in his neck and associated numbness in his left arm and the fingers of his left hand. (Tr. 79.) Plaintiff also described low back pain that radiated into his legs. (*Id.*) His ability to hold objects was weaker than it used to be. (Tr. 81-82.) He could stand or sit for a total of 20 minutes. (Tr. 86.) Due to his pacemaker, Plaintiff needed to stay away from electrical devices. (Tr. 94.) Plaintiff experienced a small episode of vertigo every week. (Tr. 96.)

During the summer, Plaintiff spent time sitting outside in his backyard in a chair.

(*Id.*)  He also swam in his heated pool, exercised to help with fibromyalgia, and did yard work. (Tr. 88.)  He used a riding law mower to mow his two lots, but needed to take a break every 15 minutes while mowing. (Tr. 88, 90.)  He occasionally helped his wife with household chores and cleaning. (Tr. 87.)

### 2. Vocational Expert's Hearing Testimony

Lynn Smith, a vocational expert, testified at Plaintiff's hearing.  The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 106.)  The individual would be able to perform sedentary work with the added limitations of being unable to reach overhead with either upper extremity. (*Id.*)  The individual could not climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (Tr. 106-07.)  The individual could frequently, but not constantly, perform fine and gross manipulation, fingering, and handling bilaterally. (Tr. 107.)  The individual must avoid close proximity to powerful electrical fields and avoid all hazards, such as dangerous machinery and unprotected heights. (Tr. 107, 109)  The individual could perform low stress work, defined as work not subjecting him to strict quotas or fast paced high production demands and work not requiring negotiation, arbitration, confrontation, directing the work of others, or being responsible for the safety of others. (Tr. 107.)  The individual required a relatively static workplace, with few changes in work processes and work settings, and could superficially interact with the public and coworkers. (*Id.*)  The VE testified that the hypothetical individual would be able to perform such jobs as an addresser, a polisher, and a document preparer. (Tr. 108.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot,* 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and*

416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.  SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2. The claimant has not engaged in substantial gainful activity since March 19, 2011, the alleged onset date.

3. The claimant has the following severe impairments: cervical and lumbar degenerative disc disease, bilateral carpal tunnel syndrome, vertigo, recurrent syncope, obesity, sick sinus node with asystole, depressive disorder, and anxiety disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) except he cannot reach overhead with either upper extremity. He cannot climb ladders, ropes, or scaffolds, but he can occasionally climb ramps and stairs. He can occasionally stoop, kneel, crouch, and crawl. He must avoid close proximity to powerful electric fields. He can frequently but not constantly perform fine and gross manipulation (fingering and handling) bilaterally. He must avoid all hazards such as dangerous machinery and unprotected heights. He can perform low stress work defined as work not subjecting him to strict quotas or fast-pace high production demands or work not requiring negotiation, arbitration, confrontation, directing the work of others or being responsible for the safety of others. He requires a relatively static work place with few changes in work process and work settings. He can superficially interact with the public and coworkers.

6. The claimant is unable to perform any past relevant work.

7.  The claimant was born on May 17, 1968, and was 42 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 19, 2011, through the date of this decision.

(Tr. 29-40.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

#### 1. The Treating Physician Rule

Plaintiff asserts that the ALJ violated the treating physician rule and ought to have provided good reasons for rejecting Dr. Vucetic's January 2013 opinion that Plaintiff suffered from fibromyalgia pain. The Commissioner contends that Dr. Vucetic's statement about Plaintiff's fibromyalgia pain does not constitute a treating physician opinion because the doctor did not address Plaintiff's ability to work or his functional limitations. As a result, the Commissioner contends that the opinion was not protected by the treating source rule. For the reasons that follow, Plaintiff's argument is well taken.

A treating source is defined as "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Generally, an ongoing treatment relationship exists

-13-

when the patient sees or has seen the treating source with a frequency consistent with accepted medical practice for the type of evaluation required for the medical condition at issue. *Id.* In order for the treating source doctrine to apply, an ongoing treatment relationship must exist at the time the physician's opinion is rendered. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506 (6th Cir. 2006). This is because "the rationale of the treating physician doctrine simply does not apply" where a physician issues an opinion after a single examination. *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). "Classifying a medical source requires us to interpret the definitions in [20 C.F.R.] § 404.1502, a question of law we review de novo." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). This Court must accord substantial deference to any factual finding by the ALJ bearing on the question. *Id.*

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)). This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants

-14-

understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson*, 378 F.3d at 544 (internal quotation marks omitted). Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

In the administrative decision the ALJ addressed fibromyalgia and concluded that Plaintiff did not have it. (Tr. 29-30.) The ALJ reached this conclusion based on opinions from one treating physician, Dr. Stewart,[1] and a consultative examiner, Dr. Koepke. (*Id.*) The ALJ explained that consultative examiner Dr. Koepke performed a tender point test, which she opined was not consistent with a diagnosis of fibromyalgia. (*Id.*) Dr. Koepke also stated that treatment notes from Plaintiff's other physicians did not reflect documentation of tender points. (*Id.*) It is unclear what treatment records Dr. Koepke had before her when she conducted her review. Dr. Vucetic, however, issued his opinion regarding fibromyalgia after Dr. Koepke's examination. As a result, Dr. Koepke could not have reviewed Dr. Vucetic's treatment notes.

It is clear that Dr. Vucetic diagnosed fibromyalgia pain. (Tr. 499.) Contrary to the Commissioner's argument, a medical diagnosis constitutes a medical opinion subject to the treating source rule if rendered by a treating physician. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are

---

[1] The ALJ noted Dr. Stewart's finding that testing did not confirm a diagnosis of fibromyaliga. (Tr. 30, 420.) The ALJ misread the treatment note on which he relied for this conclusion. The treatment note indicated that testing did not confirm rheumatoid arthritis. (Tr. 420.) While Dr. Stewart did not diagnose fibromyalgia, he listed fibromyalgia under Plaintiff's medical history. (*Id.*)

-15-

uncontradicted, complete deference."); *Tinsley v. Comm'r of Soc. Sec.*, No. 12-13163, 2013 WL 5476051, at *4 (E.D. Mich. Sept. 30, 2013) (finding that a treating physician's diagnoses ought to have been assessed pursuant to the treating physician rule).  Of course a diagnosis is not the same as a physician recommending functional limitations, but the problem here is that the ALJ never addressed Dr. Vucetic's opinion regarding fibromyalgia.  As a result, the Court is unable to ascertain whether the ALJ considered the opinion and rejected it, and if the ALJ rejected the opinion, why he did so.  The ALJ's discussion of Dr. Vucetic was limited to recounting portions of Dr. Vucetic's notes from two treatment sessions. (Tr. 34-35, citing Exhibit 13F.)

The ALJ did not state whether Dr. Vucetic was a "treating source," and this Court cannot ascertain from the ALJ's decision whether the ALJ considered Dr. Vucetic to be a treating physician.  Dr. Vucetic treated Plaintiff for the first time on January 14, 2013, and diagnosed myalgia and myositis, stating that Plaintiff suffered from fibromyalgia pain. (Tr. 494, 499.)  Plaintiff continued to treat with Dr. Vucetic in February, April, and May 2013. (Tr. 488, 470, 459.)  During May 2013, Dr. Vucetic again opined that Plaintiff suffered from myalgia and myositis. (Tr. 465.)  As Plaintiff had an on-going treatment relationship, there is substantial evidence from which the ALJ could have concluded that Dr. Vucetic is a treating source, and it is not clear what evidence, if any, supports a contrary conclusion.

Accordingly, the case must be remanded for a supported determination by the ALJ as to whether Dr. Vucetic was a treating source and the weight afforded to the physician's opinions, including his diagnosis of fibromyalgia.  If Dr. Vucetic is a treating physician and the ALJ declines to assign the opinion controlling weight, the ALJ should

-16-

provide a detailed explanation, including "good reasons" explaining why he reached that conclusion. Accordingly, Plaintiff's case is remanded to the ALJ for a more complete examination of Dr. Vucetic's opinion.

### 2. The RFC and Remand for New Evidence

### 3. The Hypothetical Question

As Plaintiff's second and third assignments of error are interrelated, this Court will discuss them together. Plaintiff argues that the ALJ did not adequately account for his limitations when formulating Plaintiff's residual functional capacity (RFC) or in the hypothetical question posed to the VE. Plaintiff contends that the RFC and hypothetical question ought to have limited Plaintiff to occasional fine and gross manipulation and provided for two to three unscheduled work breaks, approximately 15 minutes in duration. In support of these limitations, Plaintiff directs the Court to his testimony that he experienced numbness and functional limitations in his hands, as well as severe fatigue. Plaintiff also notes that Dr. Wenger diagnosed bilateral carpal tunnel syndrome and Dr. Vucetic found that Plaintiff had reduced sensation at C5-C6. Notably, Plaintiff does not point to any physician recommending the limitations he argues should have been included in the RFC and hypothetical question. For the reasons that follow, Plaintiff's argument is not well taken.

The RFC is an indication of a claimant's work-related abilities despite his limitations. *See* 20 C.F.R. § 404.1545(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1545(e). As such, the ALJ bears the responsibility for assessing a claimant's RFC

-17-

based on all of the relevant evidence, 20 C.F.R. § 404.1545(a), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.  While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) ("The determination of a claimant's Residual Functional Capacity is a determination based upon the severity of his medical and mental impairments. This determination is usually made at stages one through four [of the sequential process for determining whether a claimant is disabled], when the claimant is proving the extent of his impairments.")

Here, Plaintiff points to his testimony to support the need for further RFC restrictions.  The ALJ, however, found that Plaintiff's statements concerning his limitations were not entirely credible as they were inconsistent with his activities, other statements Plaintiff made concerning his condition, and the medical evidence detailed in the ALJ's opinion.  For example, the ALJ explained:

- Despite having pain, Plaintiff was able to perform a significant amount of physical activity.  The evidence indicated that in April 2013, Plaintiff painted his entire barn, which suggested that he was not as limited in his functioning as he alleged.  In May 2013 a treatment note indicated that Plaintiff performed welding work, which was inconsistent with his testimony.  Plaintiff mowed two yards, which took five to six hours to complete.  Additionally, Plaintiff performed household chores and drove to his appointments and the store. (Tr. 35.)

- During a March 2011 physical examination, Plaintiff exhibited a normal range of motion in the cervical, dorsolumbar, and lumbar spine. He had negative straight leg-raising tests and only mild paraspinal tenderness in the lower cervical spine.  His grip strength in both hands was good and he had 5/5 muscle strength in his upper and lower extremities. (Tr. 34-35.)

- In August 2012, a physical examination showed 4/5 muscle strength in Plaintiff's quadriceps, but otherwise normal muscle strength throughout.

Plaintiff's sensation to light touch was normal in all extremities. (Tr. 34.)

The ALJ provided reasonable grounds for discounting Plaintiff's credibility and the accuracy of his statements describing his symptoms and limitations. The ALJ was required to incorporate Plaintiff's subjective complaints into the RFC and hypothetical question only to the extent that he found them to be credible. *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) ("An ALJ is not required to accept a claimant's subjective complaints, and can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate."). The ALJ did not entirely reject Plaintiff's complaints, but instead found that Plaintiff was limited in his ability due to dizziness combined with neck, back, and hand pain, and accounted for such in the RFC. (Tr. 35, 38.)

Plaintiff also argues that findings and diagnoses from his physicians demonstrate the need for manipulative limitations and workday breaks. It is well established, however, that the "mere diagnosis" of a condition "says nothing" about its severity or its effect on a claimant's ability to perform work. *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988). Thus, the fact that a physician diagnosed Plaintiff with carpal tunnel syndrome did not, alone, require the ALJ to include limitations specifically related to the diagnosis in Plaintiff's RFC. Significantly, Plaintiff has not come forward with evidence of any physician suggesting manipulation restrictions or work breaks. Accordingly, Plaintiff has failed to show that the RFC or hypothetical question were flawed such that remand is appropriate.

As part of his second allegation of error, Plaintiff also contends that new

evidence warrants remand for further proceedings pursuant to 42 U.S.C. § 405(g). Because remand is necessary for the ALJ to evaluate Dr. Vucetic's opinion, the issue of new evidence is moot.  If appropriate, Plaintiff can submit the new evidence to the ALJ upon remand.

## VI.  CONCLUSION

For the foregoing reasons, the Commissioner's final decision is REVERSED and REMANDED for proceedings consistent with this Memorandum Opinion and Order.

**IT IS SO ORDERED**.

s/ <em>Nancy A. Vecchiarelli</em><br>U.S. Magistrate Judge

Date: December 2, 2015